Miller v. Thayer.

---

No. 20,961.

E. L. MILLER, *Appellant,* v. ALBERT S. THAYER, *Appellee.*

OPINION DENYING A REHEARING.

SYLLABUS BY THE COURT.

EXCHANGE OF PROPERTY—*False Representations—When Notice to Agent is Binding on Principal.* Notice to an agent, to be notice to the principal, must be of some matter connected with the business in which the agent is engaged for the principal. (*Roach v. Karr,* 18 Kan. 529, followed.)

Appeal from Saline district court; DALLAS GROVER, judge. Opinion denying a rehearing filed November 10, 1917. (For original opinion of affirmance, see *ante,* p. 355.)

*S. H. Allen, Otis Allen,* and *George S. Allen,* all of Topeka, for the appellant.

*C. W. Burch, B. I. Litowich,* and *LaRue Royce,* all of Salina, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff has filed a petition for a rehearing. The opinion complained of is found in *Miller v. Thayer*, ante, p. 355. An additional statement will probably make clearer the conclusion reached by the court.

The defendant on cross-examination testified that he paid Mr. Robinson $100 for going to Salina, and that he had Robinson there one week in his interests to invoice the stock of goods.

"Q. And to examine them? A. I suppose so.

"Q. And inspect them? A. Yes, sir.

"Q. And to protect your interests? A. Yes, sir, to protect my interests."

The abstract shows that Robinson's testimony was, in part, as follows:

"Mr. Thayer first spoke to me, probably a week before, at my place of business at Severy. He asked me if I would come and invoice the stock of merchandise for him if he traded for it. I told him I could n't do it. He rather insisted. Finally I told him I might be able to come. He said he was coming to look the stock over and if he made the trade he would wire me and I should come at once. I told him I could do him more good now than any other time in the conversation. He said he did n't need me at that particular time, but that if he traded for the stock he wanted me to invoice it for him.

.   .   .   .   .   .   .   .   .   .   .

"I had a talk with Mr. Thayer about these goods at lunch. I told Mr. Thayer I thought he had got hold of a bad bunch; that I did n't like the idea of taking the stock as it was marked and taking everything as it come. He told me that .was his contract. He says, 'Miller has the best of the contract; he has it all his own way, and you go on and take the goods as they are marked.' He says, 'Miller thinks there is about $17,000 of the stock; what do you think of it?' I said, 'I believe it is there.' He says, 'I don't think it is there.' I told him I believed it was there in the first place because Mr. Miller said it was there; he ought to know; in the second place the house was chucked full of merchandise and it looked like it might be there; it could be in a room with such merchandise as that was; there might be that much stock all right. That was within a couple of hours after we commenced to take the invoice. The second or third day of invoicing we came to a halt. I was so dissatisfied with some of the markings of the goods that I asked to see the contract. I presume I asked Mr. Thayer, but he did n't show it to me. He told me it was n't necessary to see it, that his contract was that he should take the stock of goods at the wholesale cost and

Miller v. Thayer.

that was to be governed by the marked price of the goods. I had that information before I commenced to invoice for Mr. Thayer. I had another talk during the invoicing, asked to see the contract and they showed it to me. I made the statement that I believed we were paying too much for the merchandise; it was marked higher than it originally cost in the presence of Mr. Thayer, probably to Mr. Miller or Mr. Thayer, I don't know 'which. Mr. Thayer gave me the contract, but did not make any statement that I remember.

. . . . . . . . . . . .

"Q. Now, to refresh your memory, did n't you tell Mr. Thayer those goods were rotten? A. I repeated that more than once, evidently.

"Q. Well, did you repeat it more than once? A. Yes, sir; clear through the stock; even in the shoes.

"Q. You applied that term to the shoes, too, did you? A. Yes, sir; especially the shoes that were taken on the bottom ledge behind the front ledges; there were two ledges of shoes, two rows of shelving; this was the back one. You remember the shoes on the back ledge was very bad.

"Q. About how frequently, during the invoice, did you tell Mr. Thayer those goods were rotten? A. I could n't tell you.

"Q. Was it more than once? A. Oh, yes; it was more than once."

Attention is again called to the manner in which the invoice was to be made. That part of the contract which refers to the invoice is found in *Miller v. Thayer*, ante, pp. 355, 356. Special questions were answered by the jury, some of which were as follows:

"2. Was the defendant induced to execute the contract for the exchange of his land by false and fraudulent representations of the plaintiff as to the character and value of the merchandise and the marks thereon? Yes.

"3. Was the defendant induced to execute the note and chattel mortgage sued on by plaintiff by false and fraudulent representations of the plaintiff as to the character and value of the merchandise and the marks thereon? Yes.

"4. If you answer the two preceding questions in the affirmative when did the defendant acquire actual knowledge of the falsity of the plaintiff's representations as to the character and value of the merchandise and the marks thereon? Latter part of January, 1914.

"10. As agent of the defendant, were Robinson's duties solely to see that the invoice was taken according to the written contract? No.

"11. Did the defendant Thayer employ M. M. Robinson to assist him in invoicing the stock of goods in controversy, and to look after his interests in connection therewith? Yes.

"12. Was M. M. Robinson an experienced merchant in the class of goods comprising the stock in question? Yes.

"13. Did M. M. Robinson learn the character and quality of the goods invoiced during the taking of the invoice? To some extent.

"14. Did M. M. Robinson communicate to Thayer the general character and quality of the goods invoiced before Thayer delivered the deeds to the land and executed the note and chattel mortgage in question in this case? No."

The plaintiff, in his brief, presented the following contentions:

"First: The district court erred in the admission of evidence.

"Second: The district court erred in the rejection of evidence.

"Third: The district court erred in refusing to give the instructions asked by the plaintiff.

"Fourth: The district court erred in the instructions given to the jury.

"Fifth: The district court erred in refusing to enter judgment on the special findings of the jury in favor of the plaintiff and against the defendant.

"Sixth: The district court erred in overruling the motion of the plaintiff for a new trial of said action."

In the former opinion an attempt was made to answer these contentions.

The plaintiff in his petition for a rehearing says:

"The most material question in the case is, what knowledge did Thayer have at the time he changed the executory into an executed contract? Did he then know that the representations made by Miller were untrue?"

These questions are questions of fact. They were answered by the jury, and those answers were justified by the evidence. With those questions answered against the plaintiff, there remains but one proposition for discussion. Was Robinson's knowledge attributable to the defendant? The rule is—

"that a principal is affected with constructive knowledge, regardless of his actual knowledge, of all material facts of which his agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, although the agent does not in fact inform his principal thereof." (2 C. J. 859.)

"The rule that notice to an agent is notice to his principal is not applicable unless the notice has reference to business in which the agent is engaged under authority from the principal, and is pertinent to matters coming within that authority; and hence a principal is not affected with knowledge which the agent acquires while not acting in the course of his employment, or which relates to matters not within the scope of his authority, unless the agent actually communicates his information to the principal." (2 C. J. 863.)

Redd v. Mining Co.

(See, also, *Roach v. Karr*, 18 Kan. 529; *Topliff v. Shadwell*, 68 Kan. 317, 74 Pac. 1120; *Despain v. Insurance Co.*, 81 Kan. 722, 729, 106 Pac. 1027.)

The contract had been signed before Robinson was employed. On its face the contract was a binding and valid obligation. Robinson was not employed to ascertain any facts that might lead to an avoidance or repudiation of the contract. The terms of his employment may be reduced to a few words. He was employed to assist in invoicing the stock in the manner provided by the contract, and to protect the plaintiff's interests in making the invoice. There was nothing in the contract to show the character of the goods. The false representations were made in conversations preceding the signing of the contract. So far as Robinson's authority was concerned, the goods might have been of a nonmerchantable character, and he might have ascertained that fact, but, unless he communicated it to the defendant, the latter would not be bound by Robinson's knowledge.

After the question of notice has been disposed of, the other matters presented by the petition for a rehearing are sufficiently answered in the former opinion.

The petition for a rehearing is denied.